ALBERTA A. NEIMAN, EXECUTRIX UNDER THE WILL OF EDITH KOLLMER HURFF, DECEASED, ET ANO, PLAIN-TIFF-RESPONDENT AND CROSS-APPELLANT, AND DAMON RUNYON MEMORIAL FUND FOR CANCER RE-SEARCH, INC., A CORPORATION OF THE STATE OF NEW YORK, PLAINTIFF-RESPONDENT; v. F. EARL HURFF, DEFENDANT-APPELLANT.

Argued November 17, 1952—Decided December 22, 1952.

56

*Mr. William J. Shepp* argued the cause for the appellant-defendant (*Mr. Mark Marritz,* attorney).

*Mr. Carl Kisselman* argued the cause for the respondents and the cross-appellant.

The opinion of the court was delivered by

VANDERBILT, C. J.   On July 31, 1950 the defendant killed his wife and thereafter pleaded *non vult* to an indictment for second degree murder for which he is now confined in prison.   During her lifetime the decedent and the defendant owned a residence in Collingswood, New Jersey, as tenants by the entirety, and certain shares of corporate stock as joint tenants.   In her will the decedent named as her sole beneficiary the Damon Runyon Memorial Fund for Cancer Research, Inc.

The plaintiff Alberta A. Neiman as executrix of the decedent sought, first, the direction of the court in regard to the rights of the Cancer Fund and of the defendant respectively in the corporate stock owned jointly by the decedent and the defendant during her lifetime, and, secondly, judgment against the defendant on three loans aggregating $2,500. The Cancer Fund sought an adjudication that the real property held by the entirety and the jointly owned corporate stock be held in trust for it by the defendant and that he be ordered to convey them to it.

The defendant contended that the title to both the realty and the corporate stock vested in him on his wife's death. He denied that he owed his wife any sum in excess of $500, and he asserted that in any event he was entitled to a lien against the corporate stock for $1,771 allegedly representing the amount advanced by him for its purchase.

The trial court ruled that the decedent having met her death at the hands of the defendant, the title to the realty was vested in him as trustee for himself individually and for the Cancer Fund; that its value at the time of her death was $14,000; that the value of the Cancer Fund's interest was

$11,597.98 (this sum representing the difference between $14,000 and "the commuted value as of the date of decedent's death of the net income of one-half of said property for the number of years of defendant's expectancy of life as determined according to the mortality tables used by this Court") ; that $11,597.98 was imposed as a lien on the real property in favor of the Cancer Fund; that the defendant pay the Cancer Fund $11,597.98 within 45 days of service of the judgment or that the Cancer Fund have execution issue. The trial court further ruled that the title to the shares of stock likewise be held by the defendant as trustee for himself and the Cancer Fund; that the value of the stock at the time of the wife's death was $2,495.63; that the value of the interest of the Cancer Fund as the sole beneficiary under the decedent's will was $2,062.61 (representing the difference between $2,495.63 and "the commuted value as of the date of the decedent's death of the net income of one-half of the said shares of stock for the number of years of defendant's expectancy of life as determined according to the mortality tables used by this Court") ; that $2,062.61 was imposed as a lien in favor of the Cancer Fund and that the defendant pay said sum within 45 days after service of the judgment or that execution issue. Finally, the trial court further held that the executrix had not proved her case as to the loans except for $500 which the defendant admitted.

From this judgment the defendant appealed and the executrix cross-appealed to the Appellate Division of the Superior Court, and we have certified the case on our own motion.

The question here presented is whether or not a murderer can acquire by right of survivorship and keep property the title to which he had held jointly with his victim. This question has never been before a court of last resort in this State, although it has been considered at length in the former Court of Chancery, *Sorbello v. Mangino,* 108 *N. J. Eq.* 292 *(Ch.* 1931) ; *Sherman v. Weber,* 113 *N. J. Eq.* 451 *(Ch.* 1933) ; and *Whitney v. Lott,* 134 *N. J. Eq.* 586 *(Ch.* 1944).

Some states have held that the legal title passes to the murderer despite his crime and that he may retain it, see *Wenker v. Landon*, 161 *Or.* 265, 88 *P. 2d* 971 (*Sup. Ct.* 1939); *Heddingfield v. Estill and Newman*, 118 *Tenn.* 39, 100 *S. W.* 108, 9 *L. R. A. N. S.* 640 (*Sup. Ct.* 1907), each involving real property held by the entirety. Some other states have held that the legal title will not pass to the murderer at all, see *Van Alstyne v. Tuffy*, 103 *Misc.* 455, 169 *N. Y. S.* 173 (*Sup. Ct.* 1918), likewise involving real property held by the entirety. A third group of states has held that legal title passes to the murderer but that equity will treat him as a constructive trustee because of his unconscionable acquisition of the property and compel him to convey it to those to whom it has been devised or bequeathed by the will of his victim, or in the absence of a will to the heirs or next of kin of the decedent exclusive of the murderer. See, in addition to the three New Jersey cases hereinbefore mentioned, *In re King's Estate*, 261 *Wis.* 266, 52 *N. W. 2d* 885 (*Sup. Ct.* 1952): *Colton v. Wade*, 80 *A. 2d* 923 (*Del. Ch.* 1951); *Grose v. Holland*, 357 *Mo.* 874, 211 *S. W. 2d* 464 (*Sup. Ct.* 1948); *Barnett v. Couey*, 224 *Mo. App.* 913, 27 *S. W. 2d* 757 (*Ct. App.* 1930); *Bryant v. Bryant*, 193 *N. C.* 372, 137 *S. E.* 188, 51 *A. L. R.* 1100 (*Sup. Ct.* 1927); all involving property held by the entirety.

To permit the murderer to retain title to the property acquired by his crime as permitted in some states is abhorrent to even the most rudimentary sense of justice. It violates the policy of the common law that no one shall be allowed to profit by his own wrong *"nullus commondum capere protest de injuria sua propria"*; see *Merrity v. Prudential Insurance Co.*, 110 *N. J. L.* 414 (*E. & A.* 1933), and *Swavely v. Prudential Insurance Co.*, 10 *N. J. Misc.* 1 (*Sup. Ct.* 1931), and the cases there collected. This doctrine, as Vice-Chancellor Jayne pointed out in *Whitney v. Lott, supra,* 134 *N. J. Eq.* 586, at 589, "so essential to the observance of morality and justice, has been universally recognized in the laws of civilized communities for centuries and is as old as

equity. Its sentiment is ageless. *Domat, pt. 2, bk.* 1; *Code Nap.* 272; *Mackelday's Roman Law,* 530; *Coke's Littleton* 148–*B; Broom's Legal Maxims* 9*th Ed.* 197." On the other hand, to divest the surviving murderer of all legal title violates or does violence to the doctrine of vested rights and would conflict with *N. J. S.* 2*A* :152–2 :

"No conviction or judgment for any offense against this state, shall make or work corruption of blood, disinherison of heirs, loss of dower, or forfeiture of estate."

But to follow the principle enunciated in the cases in our former Court of Chancery does not interfere with vested legal rights, yet by applying the equitable doctrine of a constructive trust force is given to the sound principle of equity that a murderer or other wrongdoer shall not enrich himself by his inequity at the expense of an innocent person. To quote from *"Can a Murderer Acquire Title by His Crime and Keep It?"* in Ames, *Lectures on Legal History* (1913), 310, at 321:

"The results reached in these cases must commend themselves to everyone's sense of justice. But all will admit that these results could not be accomplished by common-law principles alone. The common law would make the criminal remainderman in the one case, and the criminal joint tenant in the other case, the absolute owner of the land. Equity alone, by acting *in personam*, can compel the criminal to surrender what, in spite of his crime, the common law has suffered him to acquire."

This doctrine is so consistent with the equitable principles that have obtained here for centuries that we have no hesitancy in applying it, and we find no merit at all in the defendant's argument that the decision below works a corruption of blood or a forfeiture of estate. It would be a strange system of jurisprudence that would be able to grant relief against many kinds of accidents, mistake and fraud, by compelling a defendant to act as constructive trustee with respect to property vouchsafed him by the common law, and yet be unable similarly to touch the legal rights of a defendant who sought to profit by a heinous crime.

A more difficult question is involved in determining how much, if any, of the realty and of the shares of stock shall be held in constructive trust by the defendant for the benefit of the Cancer Fund. In the ordinary course of events the estate by the entirety in the real property would vest in the survivor absolutely and so would the ownership of the corporate stock, but it is now impossible here to determine whether husband or wife would have survived in the ordinary course of events and thus which would have become the sole owner of the property in question. Inasmuch as the husband by his wrongful act has prevented the determination in the natural course of events of whether he or his wife would survive, it is not inequitable to presume that the decedent would have survived the wrongdoer. In this situation there is no justification for determining survivorship according to the mathematical life expectancies of the decedent and her murderer. The wrongdoer, having prevented the natural ascertainment of the answer to the question of survivorship, should not be permitted to avail himself of mortality tables which may have no applicability as between him and the decedent in respect to their respective individual possibilities of survivorship. Equity therefore conclusively presumes for the purpose of working out justice that the decedent would have survived the wrongdoer. In no other way can complete justice be done and the criminal prevented from profiting through his crime, *Vesey v. Vesey*, 54 *N. W.* 2d 385 (*Minn. Sup. Ct.* 1952).

This view inevitably leads us to the conclusion that both as to the realty and the corporate stock the Cancer Fund is entitled in equity to an absolute one-half interest and a remainder interest in the other half, subject only to the value of the life estate of the defendant in such half. Thus the defendant will hold the realty in trust for the Cancer Fund subject to a lien thereon for the commuted value at the time of the decedent's death of the net income of one-half of the real property for the number of years of his expectancy of life as determined according to the mortality tables used in

our courts, *i. e.*, $2,402.02. Likewise the defendant will hold the shares of stock in trust for the Cancer Fund subject to the commuted value at the date of the decedent's death of the net income of one-half of the shares of stock for the number of years of defendant's expectancy of life as determined according to the mortality tables, or $433.02.

With respect to the loans of $2,500 claimed by the executrix to have been made to the defendant by the decedent, the, evidence shows that the sums in question ($1,500 on March 3, 1947; $500 on May 27, 1947; and $500 on February 2, 1948) were paid over by the decedent to the defendant by means of checks drawn by the decedent on her individual bank account to the order of the defendant and endorsed by him. The payment of moneys by a wife to her husband from her own individual funds creates a presumption of a loan, *Van Inwegen v. Van Inwegen*, 4 *N. J.* 46 (1950); *Yorn v. Yorn*, 139 *N. J. Eq.* 300 (*E. & A.* 1947). The defendant admitted in his answer that the check of $500 of May 27, 1947 was a loan and testified at the trial that the money was in fact used by him for the purchase of a truck for his own business. The testimony with respect to the $500 payment of February 2, 1948 is meager, but according to the defendant it was used in the repair of the house they owned by the entirety. It therefore cannot be deemed a loan, for the use to which it was put rebuts the presumption of a loan created by the naked fact of payment. But as to the $1,500 obtained by the defendant from the decedent on March 3, 1947, there is no evidence to rebut the presumption of a loan from the decedent to the defendant. Plaintiff is therefore entitled to a judgment of $1,500 with interest from March 3, 1947, and for $500 with interest from February 2, 1948.

The defendant did not introduce any evidence to support his claim of a lien of $1,771 on the corporate stock, nor was the matter briefed or argued. The claim must therefore be deemed to be abandoned.

The judgment below is modified in accordance with this opinion but without costs to either party and the cause is remanded for such further proceedings as may be necessary.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*Opposed*—None.